UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ X

AYDA HUSAM AHMAD, individually;
HASSAN MOHAMMED, individually;
BASSAM GHAYYADA, individually;
AIMAN HOSSAN, individually;
JAMILA ABDEL HAY, individually;
M.H., a minor, by his father
And natural guardian AIMAN HOSSAN and his mother
And natural guardian JAMILA ABDEL HAY;
E.H., a minor, by his father
And natural guardian AIMAN HOSSAN and his mother
And natural guardian JAMILA ABDEL HAY;
Mayor ABDELKARIM BSHARAT,
Representative of Jabaa Mosque;
FATHER ARCHIMADRITE CLAUDIUS,
Representative of Monastery of the Cross;
NEMER FATHI, individually;
MONIR QADOUS, individually;
NAJEH SAFADI, individually;
BOROSOLI EID, individually;

                              Plaintiffs,

-against-

CHRISTIAN FRIENDS OF ISRAELI COMMUNITIES;
THE HEBRON FUND, INC.;
CENTRAL FUND OF ISRAEL;
ONE ISRAEL FUND, LTD.; and
AMERICAN FRIENDS OF ATERET COHANIM, INC.,

                              Defendants.

_____ X

Civil Action No:
13-CIV-3376 (JMF) (JLC)

**ECF CASE**

**JURY TRIAL
DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiffs, by their attorneys, Melito & Adolfsen P.C., complaining of the Defendants

allege for their First Amended Complaint as follows:

## NATURE OF ACTION

1.       This is a civil action for a money judgment brought under the Alien Tort Statute

("ATS"), 28 U.S.C. § 1350 and the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, arising from

a series of terrorist attacks on civilians. The attacks took place in what is historically Judea and Samaria, and is now referred to by the U.S. State Department as the West Bank, and is considered for purposes of this lawsuit "Occupied Palestine." These attacks are carried out by Israeli Citizens ("the Settlers") who build and live in settlements ("The Illegal Settlements") illegally built and financed by Defendants in Occupied Palestine within the internationally-recognized borders of the future Palestinian state.

2.     Two of the plaintiffs are U.S. citizens who seek to recover under the ATA for personal injury and property damage. The remaining plaintiffs are nonresident aliens who seek to recover under the ATS for personal injuries and property damage caused to them by Settlers in Occupied Palestine from Defendants who operate purported charities in the United States where they collect U.S. donations which, among other things, provide "material support" within the meaning of 18 U.S.C. § 339B(g)(4) for acts of terrorism committed by the Settlers, as so-designated by the U.S. Department of State since 2011, and directly fund the Settlers and the Illegal Settlements in violation of international law and the law of nations.

3.     All of the Defendants' activities take place in the United States and thereby fall within the recent holding under the ATS by the U.S. Supreme Court until the moment when the funds they collect from U. S. donations are transferred to various persons in Israel to fund: (i) the Illegal Settlements; (ii) the taking of land in Occupied Palestine in violation of the law of nations; and, (iii) the commission of various acts that have been declared acts of terrorism by the U.S. State Department since 2011.

4.     Defendants seek contributions which they advise are tax deductible charitable contributions but are used to fund the Illegal Settlements in Israel in Occupied Palestine, and

provide "material support" for terrorist acts performed by the Settlers against the plaintiffs and others.

5.       Defendants' conduct in soliciting funds is governed by Internal Revenue Code § 501(c)(3).

6.       One or more of the Defendants advises potential donors that, if they want a tax deduction under U.S. law, they must make contributions by depositing the funds in banks in the United States maintained by the charities even though the charities also maintain bank accounts in Israel.

7.       All of the Defendants solicit contributions over the Internet.

8.       The money collected by the Defendants is provided directly to the Settlers or organizations controlled by them and used to build and maintain the Illegal Settlements, illegally take land in Occupied Palestine, to support the attacks by the Settlers on Palestinians living in Occupied Palestine, and to support the terrorist acts of the Settlers against Palestinians and other persons in Occupied Palestine.

9.       As detailed below, Defendants provide material support and financial aid to the Settlers who commit "Price Tag" attacks against people and property in Occupied Palestine, which have been labeled terrorist acts by the U.S. State Department. These "Price Tag" attacks have been committed against both Palestinians and a Christian monastery, where the Settlers have vandalized the walls with graffiti and writing hateful statements against Jesus and Christians.

10.      On March 3, 2013, The Times of Israel reported that "Israeli officials, including Prime Minister Benjamin Netanyahu, have repeatedly condemned price tag acts, demanding that those responsible for committing such acts be brought to justice."

11.    Defendants' actions are a direct cause of the injuries sustained by Plaintiffs.

12.    Defendants' actions are also the proximate cause of such injuries because the Settlers would be unable to live in Occupied Palestine but for the material support and financing provided by the Defendants.

13.    There is a proximate causal relationship between the material support and financing of the Illegal Settlements by Defendants and the taking of land in Occupied Palestine in violation of international law and the law of nations.

14.    Defendants are providing material support and financing for acts of terrorism and the efforts to drive the people of Occupied Palestine off their land.

15.    Most of the Defendants represent that the charitable donations are used for education and charitable activities.

16.    Some of the Defendants explicitly state that they are contributions so that Jews can settle in Occupied Palestine.

17.    All of the material support and financing provided by the Defendants takes place in the United States, is subject to United States Internal Revenue rules for charitable contributions, and is then wired from the United States to persons in Israel or Occupied Palestine for use by the Settlers and the Illegal Settlements.

18.    Terrorism is considered a violation of the law of nations at this time by all nations in the world.

19.    All of the nations of the world, including the United States, consider the forced taking of land in Occupied Palestine to be in violation of the Oslo Accords and consequently a violation of the law of nations.

20.     All nations subscribe to the view that the forcible taking of land and the driving of people from the land on which they live is a violation of the law of nations.

21.     The Illegal Settlements in Occupied Palestine are in violation of the Oslo Accords.

22.     The Illegal Settlements in Occupied Palestine are in derogation of the agreements made by the State of Israel in the Oslo Accords.

## THE PARTIES

### The American Plaintiffs

23.     Plaintiff Aydu Husam Ahmad, a U.S. citizen, lives in Sinjel a village located 21 kilometers northeast of Ramallah in Occupied Palestine and surrounded by the village of Turmus Ayya and the Israeli settlement of Shilo. Since 2002, Jewish Settlers have hampered Sinjel villagers' access to their traditional lands. Mr. Aydu Husam Ahmad was attacked several times by the Settlers. The latest was in May 21, 2012 where he was stoned by The Settlers when he tried to protect his olive trees from being uprooted. He filed a report with the Israeli police.

24.     Plaintiff Hassan Mohammed, a U.S. citizen, lives in Huwara village, south of Nablus City near the Yitzhar settlement in the northern West Bank.  In or around February 28, 2011, Settlers threw Molotov cocktails at Mr. Hassan Mohammed's house, burning two floors and broke all of the windows in the front of the house. On June 30, 2011 the Settlers burned a field of olive trees on Mr. Hassan Mohammed's property in Nablus. As recently as April 15, 2013, a group of Settlers again attempted to break the windows of Mr. Hassan Mohammed's house and menacing him.

25.     Plaintiffs Aydu Husam Ahmad and Hassan Mohammed are collectively referred to below as the "American Plaintiffs."

**The Nonresident Alien Plaintiffs**

26.     Plaintiffs Bassam Ghayyada, Aiman Hossan, Jamila Abel Hay, M. H., and E.H. (two minor children of Aiman Hossan and Jamila Abel Hay) are Palestinian citizens who were seriously injured in a firebomb attack carried out by Settlers on August 16, 2012. These five plaintiffs were traveling in a taxi on August 16, 2012 when a fire-bomb was thrown into the taxi outside the Gush Etzion settlement of Bat Ayin near Beit Lahem. The yellow taxi with a Green Palestinian license plate, typical of Palestinian taxis, could not have been mistaken for anything but a vehicle containing Palestinians. According to the police, the taxi flipped and burst into flames after the Molotov cocktail hit it.  Paramedics evacuated all five wounded to Hadassah Ein Karem Hospital shortly thereafter. The firebombing left three adults and two children (four members of a single family) inside the taxi with burns, some severe. Israeli officials said that Israeli Settlers were behind the attack, which took place near the Jewish settlement of Bat Ayin. Four of the victims were hospitalized with second and third-degree burns while Aiman Hossan was in intensive care for over two months. The U.S. State Department declared this firebombing a terrorist act.

27.     Plaintiff Mayor Abdulkarim Bsharat, a U.S. resident and a Palestinian citizen, is the Mayor and Sheikh of Jabaa, a village of 4,200 people about five miles from both Jerusalem and Ramallah near the Ulpana settlement. The mosque in the village was burned and vandalized on June 19, 2012 with graffiti warning in Hebrew of a "war" over the impending evacuation of the small, disputed Jewish settlement of Ulpana.

28.     Mickey Rosenfeld, as spokesman for the Israeli police, said that several suspects entered Jabaa, broke a large window in the mosque, and set a fire that burned a large section of a carpet and a wall.

29.     Plaintiff Father Claudius Archimandrite, a citizen of Greece, is the Superior of the Greek Orthodox Monastery of the Cross located in a park southeast of the Israeli museum and the Knesset (the Israeli Parliament), which was attacked on December 12, 2012. The attack on the Monastery of the Cross was the latest in a series of vandalisms of Christian holy sites. Vandals have also spray-painted three vehicles that belong to the monastery.  The cars were vandalized with the spray-painted messages "Jesus, son of a whore," "Price Tag," and "Victory for the Maccabees," a reference to a biblical victory of Jews over Greeks.  Also, the words "Price Tag" were spray painted on a Greek Orthodox monastery in Jerusalem.

30.     Plaintiff Nemir Fathi is a Palestinian citizen from Asira al-Qibliya, a village of the northern Occupied Palestine.  He was shot by a Settler from Yitzhar settlement. Several witnesses reported that Nemir was shot even though he was unarmed. A Jewish Israeli human rights organization, B'Tselem, reported on this incident.

31.     Plaintiff Monir Qadous is a Palestinian citizen from Nablus.  On October 10, 2010, at around 10 a.m., Monir Qadous was attacked and beaten by Settlers near Route 60, close to the Yitzhar Settlement.

32.     Plaintiff Najeh Safadi is a Palestinian citizen from Nablus. On May 26, 2012, a Settler shot and wounded him in a clash that began when some twenty-five Settlers from Yitzhar, several carrying arms, set fire to wheat fields and an olive grove near the village of Orif in the Northern West Bank. The victim was handcuffed by a guard from Yitzhar-settlement, who threw him to the ground and shot him while other Settlers kicked him.  Mr. Safadi was transferred in serious condition to the Rafidia Hospital in Nablus. An Israeli military spokesman confirmed that a Settler shot and wounded one Palestinian, adding that the army will investigate the incident. No charges were filed although the victim identified the attacker at the police station.

33.     Plaintiff Borosoli Eid is a Palestinian policeman from Burin village in the northern Occupied Palestine near the Yitzhar settlement. On April 19, 2012 at about 2:30 pm more than 15 Settlers walked onto his land shooting stones with a slingshot and when they got closer to the Mr. Eid, one of them shot him twice with a firearm. One bullet struck him in the hand and the other in the leg. Mr. Eid was hospitalized and had a surgery in his arm.  Mr. Eid identified two of the assailants in a police lineup in the Ariel station. He moved to a new house, which is fairly close to Givat Ronen, not long ago. Mr. Eid stated: "Twice they burned the house and four times they tried to stop the construction. They smashed tiles and cinderblocks and tried to break the foundation pillars. They burned the logs for building the roof. I fear for my children. Every night I am afraid they [the assailants] will come back again."

**Defendant Christian Friends of Israeli Communities**

34.     Defendant Christian Friends of Israeli Communities ("CFOIC") is a Minnesota corporation which is domiciled in Colorado with an office located at 3090 Angus Court, Peyton, Colorado, 80831, and does business or transacts business in New York by soliciting donations on its website over the internet.

35.     CFOIC states on its website as follows:  "Judea and Samaria is the Biblical name for the Center of the Holy Land also called the Mountains of Israel.  The media refers to this area as the 'West Bank.'  The residents of these areas otherwise referred to as 'Settlers' are fulfilling prophecy and pointing the way for the rest of the Jewish people back to their roots."

36.     The website further states "Christian Friends of Israeli Communities (CFOIC) was established in 1995 in response to the Oslo Process.  Christians around the world were deeply troubled by Israel's major territorial concessions and felt drawn to the people that stood on the forefront of Israel's territorial battle – the people of Judea and Samaria.  CFOIC provided

a much needed vehicle for Christians to become better informed about events in Israel particularly with regard to Jewish communities in the heartland of Biblical Israel to visit these areas and become personally connected to the people living there and to provide practical support for vital community needs."

37.    By supporting illegal settlements, the Defendants, including CFOIC, are supporting the illegal, tortious, and forced displacement of Palestinians from their land.

**Defendant Hebron Fund**

38.    Defendant Hebron Fund, Inc. ("The Hebron Fund") is a New York corporation with its principal place of business located at 1760 Ocean Avenue, Brooklyn, New York 11230, and does business as the "The Hebron Fund."

39.    Defendant The Hebron Fund states on its website that a "primary goal of the organization is the raising of capital for the improvement of daily life for the residents of Hebron, Israel.  This includes funding for all parks, playgrounds, recreation centers, after school programs, libraries and summer youth activities as well as sponsorship of public cultural and educational events in Hebron.   In addition, the Hebron Fund aides the maintenance and development of the Synagogues in the Mack Pala Cave, the ancient Avaham Avinu Synagogue and other religious institutions in the area."

40.    Despite the stated purpose and goal of the Hebron Fund on its website, various journalists have reported that, while there is no evidence directly linking the Fund's activity to Settlers' attacks on Palestinians, the Settlers' very presence can result in violence and violations of Israeli law.  In addition money raised by the Hebron Fund may support Settler violence for example by paying legal fees for Settlers arrested in connection with attacks.  The Hebron Fund stands out because of its support for a militant fringe of the Settler movement.  Public records in

the U.S. and Israel show that the Hebron Fund uses funds from American donors to support the activities of specific Settlers who have been convicted of deadly armed attacks on Palestinians in the past.

41.     One of the founders of the Hebron Setters' Organization which received Hebron Fund money, Ze'ev Friedman, was convicted in connection with a pair of car bombings in 1980 targeting the mayors of two Palestinian cities resulting in one blast causing the mayor of one of the cities to lose both of his legs.  In the other attack, the other mayor lost one leg.

**Defendant Central Fund of Israel**

42.     Defendant Central Fund of Israel (the "Central Fund") is believed to be a New York Corporation, although no entity with that name is on the New York State Division of Corporations' website, and the Central Fund is known to have an office located at 980 Avenue of the Americas, 3rd Floor, New York, New York 10018.

43.     The activities of the Central Fund have been widely reported in the New York Times which in a July 2010 article stated:  "A prominent clearing house is the Central Fund of Israel, operated from the Marcus Brothers' textile offices in the Manhattan Garment District. Dozens of West Bank groups seem to view the Fund as little more than a vehicle for channeling donations back to themselves, instructing their supporters that if they want a tax break they must direct their contributions there first."

44.     Defendant Central Fund states that it is providing funds for security of the Settlers which includes guns, ammunition and other equipment needed to facilitate protection of the land and its attacks on Palestinians who venture anywhere near the settlements.

**Defendant One Israel**

45.     Defendant One Israel Fund, Ltd. ("One Israel") is a New York Corporation with an office located at 1175 West Broadway, Suite 10, Hewlett, New York 11557.

46.     Defendant One Israel specifically states on its website that it is providing security for the Settlers: "Improving the security of every community in town in Judea and Samaria is the heart and soul of One Israel Fund's mission.  In light of the recent budget cuts that have been made to the IDF and the cutback of checkpoints allocated to protect these communities the security resources and training we provide is paramount to the future of these areas."

**Defendant American Friends of Ateret Cohanim**

47.     Defendant American Friends of Ateret Cohanim ("Ateret Cohanim") is a New York Corporation with an office located at 248 West 35th Street #406, New York, New York 10018.

48.     The IRS is told that the defendant Ateret Cohanim is funding day camps and nurseries, housing renovation and repair, security equipment, seminars, newsletters and tours which are charitable purposes.  However, guests who attend annual dinners are told that the goal is to "promote the political goal of 'strengthening, securing, and keeping Jerusalem united'" by the use of the Jerusalem Reclamation Project, which is not believed to be a tax-exempt organization, and funds the purchasing and of buildings to provide housing and communal facilities.

## JURISDCTION AND VENUE

49.     This court has subject matter jurisdiction over the action under 18 U.S.C. §§ 233(a) and 2338, which authorize a private damage action in any appropriate District Court by a United States national who is injured "in his person, property or business by reason of an act of

international terrorism." Subject-matter jurisdiction is also conferred by 28 U.S.C §§ 1331 and 1332 (a)(1)-(3).

50.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) and § 2334(a).

51.   Defendant CFOIC is subject to the jurisdiction of this Court because it transacts business within New York by soliciting contributions from the internet, or receives funds from New York residents.

52.   Defendant Hebron Fund is subject to the jurisdiction of this Court under 18 U.S.C §2334(a) because it is a New York Corporation with an office located at 1760 Ocean Avenue, Brooklyn, New York 11230.

53.   Defendant Central Fund is subject to the jurisdiction of this Court under 18 U.S.C §2334(a) because it is believed to be a New York Corporation or has its principal place of business at 980 Avenue of the Americas, 3rd Floor, New York, New York 10018.

54.   Defendant One Israel is subject to the jurisdiction of this Court under 18 U.S.C §2334(a) because it is a New York Corporation with an office located at 1175 West Broadway, Suite 10, Hewlett, New York 11557.

55.   Defendant Ateret Cohanim is subject to the jurisdiction of this court because it is a New York Corporation with an office located at 248 West 35th Street #406, New York, New York 10018.

## STATEMENT OF FACTS

### The Settlers

56.   The Settlers are Israelis who live in The Illegal Settlements built illegally in Occupied Palestine, including East Jerusalem, within the internationally recognized borders of the future Palestinian state.

57.     The construction and continued expansion of the Illegal Settlements constitute a grave violation of the Fourth Geneva Convention and the Rome Statute of the International Criminal Court.

58.     Today, there are over half a million illegal Settlers in Occupied Palestine, including East Jerusalem, many of whom were originally encouraged to move to the Illegal Settlements through a variety of economic incentives.

59.     There are Settler groups who have adopted a so-called "Price Tag" policy. These Settlers claim that they carry out attacks on Palestinian communities in response to unpopular decisions or actions taken by the Israeli government which are perceived to harm the Illegal Settlements and the Settlement enterprise.

60.     Settler violence against Palestinian civilians in Occupied Palestine is part of the grim daily life under occupation for Palestinians, a reality that has continued for forty-five years. In recent years, however, these terrorist attacks have increased dramatically producing a situation of constant fear and insecurity among Palestinians.

61.     Bat Ayin (Hebrew: בַּת עַיִן) is a Settlement in Gush Etzion in the West Bank, between Jerusalem and Hebron. It is administered by the Gush Etzion Regional Council and has a population of 1,000. The international community considers the Settlements in Occupied Palestine illegal under international law, but this is disputed. Bat Ayin was established by seven families led by Rabbi Yitzchak Ginsburg in 1989. It was founded on land purchased by the Jewish Agency in the early 1900s.

62.     Yitzchak Ginsburg (born November 14, 1944) is an American-born Israeli rabbi. He is a follower of the Chabad Lubavich movement, and currently Rosh Yeshivah of the Od Yosef Chai Yeshivah in the Yitzhar Settlement in the Occupied State of Palestine, and the leader

of the Kabalistic Gal Einai organization. He has published numerous books advocating the killing of non-Jews, denying Arabs the right to exist and praising mass murderer Barauch Goldstein, who opened fire on a group a of Muslim worshipers in Hebron in 1994, killing 29 and wounding 125. A charge of incitement of racism was dropped after he made a clarification statement.

63.    Yitzchak Ginsburg is the head of Odyosefhai Rabbinical College, in the Yitzhar settlement.   The College operates two Yeshivas, a seminary and a publishing house. On its website, the College praises the so-called 'hilltop youth' who have carried out hundreds of terrorist attacks against Palestinians.

64.    At all time relevant hereto, Settlers in the Yitzhar Settlement are and were radical Jews which view the Palestinians as their enemies.  Odyosefhai Rabbinical College is headed by Rabbis Yitzchak Ginzburg and Yitzhak Shapira. Both Rabbis have published books and pamphlets advocating the killing of non-Jews, denying Arabs the right to exist, and praising mass murderer Barauch Goldstein, who opened fire on a group of Muslim worshipers in Hebron in 1994, killing 29 and wounding 125. On its website the College praises the so-called "hilltop youth" who have carried out hundreds of terrorist attacks against Palestinian villages.

65.    At all time relevant hereto, the Settlers of Yitzhar sought, as an official and publicly stated policy and goal, to murder or expel the Palestinian residents.

66.    Since its founding and until the present day, Settlers of Yitzhar have used terrorism against Palestinians in Occupied Palestine in order to coerce, intimidate, and influence the Israeli government and public and thereby ultimately bring the expulsion of the Palestinian residents from Occupied Palestine.

67.     Since its inception, the policy of the Yitzhar Settlement carrying out terrorist attacks against Palestinians was notorious and well known to Defendants and to the public at large.

68.     The Defendants allocate funds on an annual basis to the Illegal Settlements across Occupied Palestine by transferring funds collected all over the United States directly to the Settlers and the Illegal Settlements (the "Wire Transfers").

69.     The Defendants carried out Wire Transfers with the specific purpose and intention of enabling and assisting the so-called 'hilltop youth,' who have carried out hundreds of terrorist attacks against Palestinians.

70.     Recent reports indicate that 2011 was by far the most violent year for Palestinians in terms of violent acts committed by the Settlers. These attacks include shootings, physical attacks, arson attacks (such as the torching of mosques, churches and farmland), stone throwing and the destruction of property and vehicles. During 2011, Settlers uprooted or damaged 10,000 Palestinian trees, and attacked civilians, resulting in the killing of 3 Palestinian civilians and the injury of 183 others.

71.     According to the office of the United Nations High Commissioner for Human Rights, 2012 looks to be even more violent; there have been 154 attacks in the first half of 2012 alone.

72.     Most recently, in its annual report on terrorism in foreign countries, the U.S. State Department declared so-called "Price Tag" attacks against Palestinians in Occupied Palestine to be "terrorist incidents."

73.     International condemnation of Settler violence over the past year has been strong and widespread. In February 2012, the EU Heads of Mission updated a report from the previous

year on the issue of Settler violence, in which they highlighted the alarming phenomenon of increasing Settler violence.

74.     In April 2012, the Middle East Quartet added to the widespread condemnation in a statement which "expressed its concern over ongoing Settler violence and incitement" in Occupied Palestine "and called on Israel" to take effective measures, including bringing the perpetrators of such acts to justice.

75.     While condemnation from bodies such as the UN, EU and the Middle East Quartet has been firm, this violence by the Settlers continues.

76.     In February 2012, the EU Heads of Mission updated a report from the previous issue of Settler violence, in which they highlighted, the alarming phenomenon of increasing Settler violence in Occupied Palestine and described the nature of the attacks: "Settler attacks against Palestinian livelihoods, including the takeover of and damage to private property, regular vandalism of cars, hindered access to agricultural lands and attacks on livestock and agricultural land." The report confirms that there has been no widespread response from Palestinian side.

### The Settlers' "Price Tag" Attacks

77.     The Settlers have openly, publicly and repeatedly acknowledged having a policy that is referred to as "Price Tag" attacks.

78.     "Price Tag" is a term frequently used to describe acts of vandalism by radical Israeli Settlers exacting in "price" against Palestinian targets or Israeli security forces in response to actions by the Israeli government.

79.     Many Palestinians were forcibly displaced due to Settlers attacks and more than 250,000 Palestinians remain at risk of Settler violence, 76,000 of whom are deemed to be at high risk.

80.     Most of the Settler attacks take place in areas where Israel has security jurisdiction under the Oslo Accords.

81.     On June 19, 2012, a group of Settlers arrived at the village of Jabaa around 1:30 a.m. and broke one of the windows of the mosque and threw flammable material, burning a carpet, a door and window. Graffiti was written on the wall reading "Ulpana," "The war has started" and "Price Tag."   It was part of series attacks carried by Settlers from Ulpana in so called Price Tag in retaliation after Israel's Supreme Court ruled that Ulpana was constructed on Palestinian private land.

82.     As noted above, on December 12, 2012, vandals spray-painted profanities on the entrance to and on three vehicles belonging to the Monastery of the Cross in a spate of so-called "Price Tag" attacks. The attack on the Monastery of the Cross was the latest in a series of vandalisms against Christian holy sites. Vandals have also spray-painted cars with the messages "Jesus, son of a whore," "Price Tag," and "Victory for the Maccabees."  Also, the words "Price Tag" were spray painted on a Greek Orthodox monastery in Jerusalem. Similar attacks have since occurred. In both cases the police have made no arrests.

83.     In a May 2013 article by Ynet News, in apparent response to Palestinian and international outcry, the Israeli Minister of Justice and the Public Security Minister have called for meetings to be conducted among members of the Israeli Cabinet and to declare that the "Price Tag" attacks are acts of terrorism.

## AS AND FOR A FIRST CAUSE OF ACTION
## ON BEHALF OF THE U.S. CITIZEN PLAINTIFFS
## AGAINST DEFENDANTS PURSUANT TO 18 U.S.C. § 2333
## FOR ACTS OF
## INTERNATIONAL TERRORISM

84.    Plaintiffs repeat and re-allege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

85.    The actions of Defendants in executing the Wire Transfers to Settlers constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

86.    As required by § 2331, the actions of the Defendants in executing the Wire Transfers to The Settlers for the Illegal Settlements constituted a violation of the criminal laws of the United States including, without limitation, the criminal provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which prohibit the provision of material support and resources to terrorist groups.

87.    The actions of Defendants in executing the Wire Transfers therefore constituted "material support" within the meaning of 18 U.S.C.  § 339B(g)(4) for acts of terrorism of the Settlers as designated by the U.S. Department of State since 2011.

88.    As required by § 2331, the Defendants' actions in executing Wire Transfers were dangerous to human life, since The Settlers have committed Price Tag attacks which were labeled acts of terrorism by the U. S. State Department.

89.    As required by § 2331, the Defendants' actions in executing the Wire Transfers transcended national boundaries in terms of the means by which they were accomplished and locales in which they operates

90.     Section 2331(1)(B) defines "international terrorism" as "activities that ... appear to be intended to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion."

91.     Defendants are providing material support to the Settlers for their common goal of building the Illegal Settlements and intimidating and coercing a civilian population.

92.     Defendants are providing material support to the Settlers for their common goal of building the Illegal Settlements to influence the policy of a government of The State of Israel by intimidation or coercion.

93.     Defendants knowingly and intentionally carried out the Wire Transfers, totaling millions of dollars, on an on-going basis over a period of several years.

94.     Defendants carried out the Wire Transfers to the Settlers with the specific purpose and intention of enabling and assisting the Settlers to carry out terrorist attacks against Palestinian civilians in Occupied Palestine.

95.     As a direct and proximate result of the Defendants' execution of the Wire Transfers, the American Plaintiffs suffered the harm described herein.

96.     The actions of Defendants provide material support for "acts of international terrorism" within the meaning of 18 U.S.C. §§ 2331 and 2333.

97.     As a direct and proximate result of the Defendants' conduct, the American Plaintiffs suffered the harm described herein.

98.     Defendants' actions are also the proximate cause of plaintiffs' injuries because the Settlers would be unable to live in Occupied Palestine or build and maintain the Illegal Settlements but for the material support and financing provided by the Defendants.

99.     The Defendants are therefore liable for all of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**AS AND FOR A SECOND CAUSE OF ACTION
ON BEHALF OF THE PALESTINIAN PLAINTIFFS
PURSUANT TO 28 U.S.C. § 1350 AGAINST THE DEFENDANTS
FOR TORTS IN VIOLATIONS OF
INTERNATIONAL LAW AND THE LAW OF NATIONS**

100.    Plaintiffs repeat and re-allege each of the foregoing paragraphs with the same force and effect as if more fully set forth herein.

101.    The United States District Courts "have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States," pursuant to 28 U.S.C. § 1350

102.    All of the Defendants' activities take place in the United States, and thereby fall within the recent holding under the ATS by the U.S. Supreme Court, since the funds they collect from U. S. donations are transferred to various persons in Israel to fund: (i) the Illegal Settlements; (ii) the taking of land in Occupied Palestine in violation of the law of nations; and, (iii) the commission of various acts that have been declared acts of terrorism by the U.S. State Department since 2011.

103.    Terrorism is considered a violation of the law of nations at this time by all nations in the world.

104.    Under U.S. law the term "terrorism" means "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." 22 U.S.C. § 2656 (d).

105.    Under U.S. Law, "terrorist activities" include "fundraising" and "financing" of terrorism. 22 U.S.C. § 2656 (d).

106.    The Illegal Settlements violate the Oslo Accord.

107.    The Illegal Settlements in and of themselves, which are funded, financed, and maintained with funds from the Defendants, are a violation of the law of nations.

108.    The Settlers' actions described herein, i.e. its attempts to physically exterminate or expel the Palestinian residents of Occupied Palestine and its intentional and systematic use of violence against civilians, constitute genocide, crimes against humanity and war crimes under customary international law, and therefore constitute violations of "the law of nations" within the meaning of 28 U.S.C. § 1350.

109.    The Defendants knowingly and intentionally carried out the Wire Transfers, totaling millions of dollars, on an on-going basis over a period of several years to fund the Settlers, including their acts of Terrorism as identified by the U.S. State Department and members of the Israeli government, and to build and maintain the Illegal Settlements in violation of the Oslo Accords and the law of nations.

110.    The Defendants carried out the Wire Transfers with the specific purpose and intention of enabling and assisting the Settlers to carry out a goal of physically exterminating or expelling the Palestinian residents of Occupied Palestine and its goal of intentionally and systematically using violence against Palestinian civilians in Occupied Palestine.

111.    All of the material support and financing provided by the Defendants takes place in the United States, is subject to United States Internal Revenue rules for charitable contributions, and is wired from the United States to persons in Israel or Occupied Palestine for use by the Settlers and the Illegal Settlements.

112.    Defendants operate purported charities in the United States where they collect U.S. donations which, among other things, provide "material support" within the meaning of 18

U.S.C.  § 339B(g)(4) for acts of terrorism of the Settlers as designated by the U.S. Department of State since 2011 and directly fund the Settlers and the Illegal Settlements in violation of international law and the law of nations.

113.   Defendants' conduct in soliciting funds takes place in the United States and  is governed by Internal Revenue Code § 501(c)(3).

114.   One or more of the Defendants advises potential donors that, if they want a tax deduction under U.S. law, they must make contributions by depositing the funds in banks in the United States maintained by the charities even though the charities also maintain bank accounts in Israel.

115.   The actions of Defendants provide material support and financing to enable the Settlers' acts of genocide, crimes against humanity and war crimes under the law of nations.

116.   As a direct and proximate result of the Defendants' conduct, the Palestinian Plaintiffs suffered the harm described herein.

117.   The torts of the Defendants for which plaintiffs seek recovery by the commencement of this action are continuing wrongs.

118.   The Defendants are liable for all of the damages suffered by the Palestinian Plaintiffs in such sums as may hereinafter be determined.

119.   The Defendants' conduct in funding and financing the Settlers and The Illegal Settlements was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages.

## JURY TRIAL

Plaintiffs demand a jury trial.

Respectfully submitted,

**MELITO & ADOLFSEN P.C.**

By:  Louis G. Adolfsen (LA 5431)
233 Broadway
New York, New York 10279
Telephone: (212) 238-8900
Facsimile:  (212) 238-8999
E-mail: lga@melitoadolfsen.com


S. Dwight Stephens (SS 2161)
Rania Shoukier (RS 7317)
Michael F. Panayotou (MP 7744)
*Of Counsel*
E-mail: sds@melitoadolfsen.com
E-mail: Shoukier@arablegalusa.com
E-mail: mfp@melitoadolfsen.com


*M&A 100534*