UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____ X

AYDA HUSAM AHMAD, individually;
HASSAN MOHAMMED, individually;
BASSAM GHAYYADA, individually;
AIMAN HOSSAN, individually;
JAMILA ABDEL HAY, individually;
M.H., a minor, by his father
And natural guardian AIMAN HOSSAN and his mother
And natural guardian JAMILA ABDEL HAY;
E.H., a minor, by his father
And natural guardian AIMAN HOSSAN and his mother
And natural guardian JAMILA ABDEL HAY;
Mayor ABDELKARIM BSHARAT,
Representative of Jabaa Mosque;
FATHER ARCHIMADRITE CLAUDIUS,
Representative of Monastery of the Cross;
NEMER FATHI, individually;
MONIR QADOUS, individually;
NAJEH SAFADI, individually;
BOROSOLI EID, individually;

                    Plaintiffs,

-against-


CHRISTIAN FRIENDS OF ISRAELI COMMUNITIES;
THE HEBRON FUND, INC.;
CENTRAL FUND OF ISRAEL;
ONE ISRAEL FUND, LTD.; and
AMERICAN FRIENDS OF ATERET COHANIM, INC.,

                    Defendants.

_____ X

Civil Action No:
13-CIV-3376 (JMF) (JLC)

**ECF CASE**

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**MELITO & ADOLFSEN P.C.**
**233 BROADWAY**
**NEW YORK, NEW YORK 10279**
**Tel. No.: (212) 238-8900**
**Fax: (212) 238-8999**
**lga@melitoadolfsen.com**

*Of Counsel:*

*Louis G. Adolfsen, Esq.*
*S. Dwight Stephens, Esq.*
*Rania Shoukier, Esq.*
*Michael F. Panayotou, Esq.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

COUNTERSTATEMENT OF FACTS ............................................................ 5

    Defendants' Funding and
Financing of Terrorism under U.S. Law
and In Violation of International Law ................................................... 5

    The Injuries Caused to Plaintiffs
By Defendants' Funding and Financing ............................................... 8

ARGUMENT ................................................................................................... 11

POINT I

PLAINTIFFS' ATA CLAIM ALLEGES FACTS THAT FIT
SQUARELY WITHIN THE DEFINITIONS OF THE ATA. .......................... 11

Proximate cause is
Alleged in the Complaint ............................................................................ 11

The ATA does not require Terrorists
to be part of a designated FTO ................................................................... 12

The Complaint does not rest on
Conclusory allegations ............................................................................... 14

POINT II

THE ALLEGATIONS OF THE ATS CLAIM DETAIL THE FINANCING
AND FUNDING OF VIOLENCE INTENDED TO INTIMIDATE AND
COERCE THE PLAINTIFFS IN VIOLATION OF ESTABLISHED
NORMS OF INTERNATIONAL LAW NOW ALSO CODIFIED AND
DEFINED UNDER U.S. LAW ..................................................................... 16

CONCLUSION .............................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

**<u>Case</u>**                                                                                                          **<u>Page</u>**

*Almog v. Arab Bank PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007) ...........................16, 17

*Bell Atlantic Corp v. Twombly*, 550 U.S. 544 (2007)....................................................14

*Boim v. Holyland Found. for Relief & Dev.*, 549 F.2d. 685 (7th Cir. 2008) ..................15

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir.1980) ...................................................19

*Gill v The Arab Bank*, 893 F.Supp.2d 474 (E.D.N.Y. 2012)........................................15

*In re Terrorist Attacks on September 11, 2001,*
   714 F.3d 118 (2d Cir. 2013) ..........................................................11, 13, 14, 20

*Kiobel v. Royal Dutch Petroleum Co. – U.S. -- ,* 133 S.Ct. 1659 (2013) ..........................5

*Orkin v. Swiss Confederation*, 444 Appx. 469 (2d Cir. 2011) ......................................19

*Presbyterian Church of Sudan v Talisman Energy*, 244 F. Supp.2d 289 (S.D.N.Y. 2003)............22

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013)................................................11, 14

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ..........................................................19

*Strauss v. Credit Lyonnais, S.A. — F. Supp. 2d --,* 2013 WL 751283(E.D. New York 2013)......12

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984)..............................19

**<u>Statutes</u>**

18 U.S.C. § 2331 et seq. .................................................................................................1

18 U.S.C. § 2331 and 2333..........................................................................................12

18 U.S.C. § 2333(a). ...................................................................................................12

18 U.S.C. 2331(1) (A)-(C). ........................................................................................12

18 U.S.C. §2339C......................................................................................................14

22 U.S.C. § 2256f(d) ...............................................................................................5, 16

26 U.S.C. § 501(c)(3) ..............................................................................................5, 18

28 U.S.C. § 1350 ...........................................................................................................1

## INTRODUCTION

This is a lawsuit under two federal statutes with very different histories enacted for very different purposes. The Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 et seq., was enacted in light of the terrorism in the late Twentieth Century with the specific purpose of allowing a U.S. citizen to sue for damages for a terrorist act that took place extraterritorially in another country. The Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, was enacted in 1789 as a result of incidents involving diplomats in the U.S. to provide jurisdiction in the district court for torts committed against aliens. The ATA specifically defines international terrorism and financing and funding of terrorism. The ATS contains no definitions and looks to violations of a treaty of the United States or the law of nations, i.e. international law, to determine if a plaintiff can recover. Yet despite the centuries separating their enactment and the differences in framework, both statutes operate at this time to provide liability for the U.S.- based funding and financing of violence in other countries intended to intimidate the noncombatant, civilian population, under the ATA based on its definitions, and under the ATS because the same conduct violates international norms.

Defendants are U.S. charities that fund and finance Jewish groups operating in the West Bank and Jerusalem which, like Hamas, contain violent factions that attack non- Jews in an attempt to intimidate them. Defendants' conduct is actionable under the ATA as to the U.S. plaintiffs because it fits squarely within its definitions the "financing" of "international terrorism" that appears intended "to intimidate or coerce a civilian population." Their conduct is also actionable under the ATS because the financing of such violence against a civilian population is prohibited under all norms of international law.

1

This lawsuit is no different from dozens of lawsuits against groups that are alleged to have financed terrorism or violations of the norms of international law. The only difference between this lawsuit and those cases is that those lawsuits generally involve funds given to Hamas and Hezbollah and other recognized violent groups. This lawsuit involves the giving of funds to groups that are less recognizable but are well known to defendants who support violent factions just like those in Hamas and Hezbollah.

The defendants in other lawsuits said that groups like Hamas also provide charitable and social services. They said the money they gave was intended to support only those services and not to support violence. Defendants here make the same claim. The courts repeatedly reject such claims.

The defendants in other lawsuits said they did not know or intend the money they furnished to be used to commit violence. Defendants here make the same claim. The courts said it was enough to simply be "indifferent" as to how the money is used.

The defendants in other lawsuits said that they were not parties to any violent acts and that it could not be shown that their money was used to support violence instead of the group's charitable or social functions. Defendants here make the same claim. The courts said that any money given to groups like this supports the group's violence and that the defendant who provides funds to the group can be liable as a secondary actor for the underlying act of violence.

Defendants' motion to dismiss attempts to characterize this lawsuit as a "poorly disguised attempt to cripple five upstanding American charities" and asserts that the complaint should be dismissed because it contains only "conclusory allegations." Defendants could not be more wrong on both counts.

This is a lawsuit in which individuals and two institutions seek to recover damage for personal injuries and property damage.  The allegations of the complaint are not conclusory but say very specifically and in detail precisely what the plaintiffs are claiming. Plaintiffs allege that defendants are funding and financing terrorism including what are called "price tag" attacks by specific groups such as "The Hilltop Youth" in violation of U.S. and international law.

Defendants rely heavily on the Second Circuit's holding that "no universal norm against terrorism existed under customary international law (*i.e.,* the "law of nations") as of September 11, 2001…" but that is certainly not the case today. Congress defines terrorism in the ATA as conduct that appears to be intended "to intimidate or coerce a civilian population." There is now universal agreement that this same conduct violates international law.

Defendants' conduct sounds just like conduct Israel condemns as  reported on June 16, 2013 in the Israeli press by Haaretz:

> "Just this week we made decisions that allow us to act more forcefully against the people who commit these crimes and we will do so with full force," Netanyahu added, referring to the cabinet decision that stopped short of calling the perpetrators of price tag attacks "terrorists," and instead deeming them part of forbidden organizations, similar to groups that funnel money to Hamas and Islamic Jihad." http://www.haaretz.com/news/diplomacy-defense/1.530571

The plaintiffs·are not seeking to affect the political process or in any way engage the State of Israel in the matter.  They are not seeking any relief against what they consider the Illegal Settlements in what plaintiffs refer to as Occupied Palestine. They are not claiming that all Israeli settlers are terrorists or that all actions by Israeli settlers constitute acts of terrorism.

The claims asserted in the Amended Complaint are not conclusory allegations as the defendants suggest.  Defendants may argue that, in their analysis, the allegations as pled do not constitute violations of the ATA under its definitions or that the allegations do not show that the acts of various Israeli settlers constitute conduct that is prohibited under international norms. But

they cannot plausibly say that plaintiffs have not pled in detail specifically: (1) what they are claiming; (2) under which statutes; (3) by which individuals; and, (4) precisely why they believe their claims constitute terrorism under various U.S. statutes and international law.

As required by the case law, the actions of the Israeli settlers who engage in terrorism are fairly traceable to the funds provided by the defendant charities. The injuries and damages are proximately caused by this funding and financing by defendants. Plaintiffs have alleged how, but for these funds, these acts of terrorism would not be possible. Indeed, defendants say as much when they solicit funds for the Settlers who could not live and flourish without their financing and funding.

Defendants suggest that they have no awareness that these attacks have been going on for years, have been carefully documented, and have been reported and condemned throughout the international community including by the State of Israel and Prime Minister Benjamin Netanyahu.

The two Second Circuit cases principally relied on by the defendants do not require dismissal of the claim here. One of the cases involves a bank and a broad claim that any funds transferred by that bank to the Government of Iran must be supporting and causing injuries through the actions of Hezbollah. Unlike the case involving the Government of Iran, the money wired by the defendants to the Israeli settlers goes directly for their use, including for the use of those settlers who commit the acts of terrorism alleged in the complaint. The second case addresses many different types of claims but principally holds that, as of September 11, 2001, terrorism was not recognized as a violation of international law. Today, international terrorism and terrorism are defined in the United States Code.

The ATS claims by the alien plaintiffs properly allege a violation of international law. These Price Tag attacks and the firebombing, shootings and beatings described in the complaint violate all standards of international law and U.S law because they involve subnational groups and are intended to intimidate or coerce the civilian population of noncombatants. *See, e.g.*, 22 U.S.C. § 2256f(d). The defendants' U.S.-based tortious activities in fundraising and financing Settlers who engage in terrorism in violation of international law, as also defined in U.S. law, are actionable under the ATS. *Kiobel v. Royal Dutch Petroleum Co.* – U.S. -- , 133 S.Ct. 1659 (2013).

## COUNTERSTATEMENT OF FACTS

**Defendants' Funding and
Financing of Terrorism under U.S. Law
and In Violation of International Law**

All of the defendants are U.S. charities that enjoy tax exempt status under Internal Revenue Code § 501(c)(3). Funds collected by the charities are sent by wire to various Settler schools and communities in occupied Palestine to finance various aspects of life in the illegal settlements including the furnishing of funds for "security." All of the defendants seek contributions over the internet. They advise potential donors that, if they want a tax deduction under U.S. Law, they must make contributions by depositing the funds in banks in the United States maintained by the charities even though some of the charities maintain bank accounts in Israel (Amended Complaint ¶¶ 5-7). The money collected by the defendants is provided directly to the Settlers or organizations controlled by them to finance and maintain what plaintiffs assert are Illegal settlements on land which plaintiffs contend was illegally taken in occupied Palestine. More important, the money supplied by defendants to the Israeli settlers supports attacks by Settlers on Palestinians and other non-Jews living in occupied Palestine. (¶¶ 8-90).

Defendants' intentions are well known because they are stated openly on their web sites.

Christian Friends of Israeli Communities ("CFOIC") states on its web site that:

> "Judea and Samaria is the biblical name for the center of the holy
> land also called the mountain of Israel.  The media refers to this
> area as the 'West Bank.'  The residents of these areas otherwise
> referred to as 'settlers' are fulfilling prophecy and pointing the way
> for the rest of the Jewish people back to their roots."
> www.cfoic.com/what-is-settlement/

Defendant CFOIC was established because of the Oslo Accord because, as their group

sees it: "Christians around the world were deeply troubled by Israel's major territorial

concessions and felt drawn to the people that stood on the forefront of Israel's territorial battle—

the people of Judea and Samaria."  *Id.* ¶¶ 35-36.

Similarly, Defendant One Israel states on its web site (¶46):

> "Improving the security of every community and town in Judea and Samaria is
> the heart and soul of One Israel Fund's mission.  In light of the recent budget cuts
> that have been made to the IDF and the cutback of check points allocated to
> protect these communities, the security resources and training we provide is
> paramount        to        the        future        of        these        areas."
> www.oneisraelfund.org/projectsnew/default.

Defendant Ateret Cohanim says its funding is used for "day camps and nurseries,

housing renovation and repair, security equipment," etc.  However, guests who attend annual

dinners are told that the goal of defendant Ateret Cohanim is to "promote the political goals of

'strengthening security and keeping Jerusalem united."   In other words, defendant Ateret

Cohanim is attempting to fund the annexation of East Jerusalem which is populated by Arabs

and which is a source of violent attacks reported frequently in the Israeli press (¶46).

Defendant Central Fund states that it is providing funds for security of the settlers which

includes guns, ammunition and other equipment needed to facilitate protection of the land and its

attacks on Palestinians who venture anywhere near the settlements.  According to the New York

Times, "dozens of West Bank groups seem to view the fund as little more than a vehicle for channeling deductions back to themselves, instructing their supporters that if they want a tax break they must direct their contributions there first." (¶43).

The source of the violence and its funding is widely known. According to the Jewish Weekly, the Shin Bit recommended the closing of the Yeshiva Od Yosef Chai in the Yitzhar Settlement. The Yeshivsa is headed by Rabbi Yitzchak Ginsburg and Yitzhak Shapira who publish books and pamphlets advocating the killing of non-Jews, denying Arabs the right to exist, and praising mass murderer Barauch Goldstein, who opened fired on a group of Muslim worshippers in Hebron in 1994 killing 29 and wounding 125.  The web site of the college praises the so called "hilltop youth" who carried out hundreds of terrorist attacks against Palestinian villages.     http://www.thejewishweek.com/news/breaking_news/israel_shuts_yeshiva_because students_alleged_attacks_arabs.

Haaretz also reported that Israel's Attorney General backed the Israeli Education Ministry's decision to stop funding Od Yosef Chai Yeshiva in Yitzhar after its leaders and students    took    part    in    violence    against    Palestinians    and    Israeli    forces. http://www.haaretz.com/news/diplomacy-defense/israel-s-attorney-general-backs-move-to-cut-funding-of-west-bank-yeshiva-due-to-violence-against-palestinians.premium-1.514779.   Haaretz also reports that the Yeshiva received considerable funds from the defendant Central Fund operated  by  the  Marcus  Brothers  Textile  store  on  Sixth  Avenue  in  Manhattan. http://www.haaretz.com/print-edition/features/akiva-eldar-u-s-tax-dollars-fund-rabbi-who-excused-killing-gentile-babies-1.2137

Defendants may claim to have no intention to fund any violent attacks. However, they certainly cannot contend that they do not know of the widely reported attacks by various organizations. They also know the charitable donations they collect are wired to these organizations.

**The Injuries Caused to Plaintiffs**
**By Defendants' Funding and Financing**

Plaintiff Aydu Husam Ahmad is a U.S. citizen who lives in Sinjel which is northeast of Ramallah in Occupied Palestine. Since 2002 Mr. Ahmad has been among the Sinjel villagers who have been hampered by access to their traditional lands. He was attacked several times by the settlers, the latest on April 21, 2012 when he was stoned by settlers as he tried to protect his olive trees from being uprooted. He filed a report with the Israeli Police. (¶23)

Plaintiff Hassan Mohammed is a U.S. citizen who lives in Horora which is south of Nablus City near the Yitzhar settlement in the north. In or around February 28, 2011, settlers threw Molotov cocktails at Mr. Mohammed's house, burning two floors, and broke all of the windows in front of the house. On June 30 of that year, the settlers burned a field of olive trees on his property in Nablus and, as recently as April 15 of this year, a group of settlers again attempted to break the windows of his house and menace him (¶24).

Plaintiffs Bassam Ghayyada, Aiman Hossan, Jamila Abel Hay, M.H. and E.H., the two minor children of Aiman Hossan and Jamila Abel Hay, are Palestinians who were seriously injured in a firebomb attack on a taxi in which they were riding. The vehicle had a green Palestinian license plate, typical of Palestinian taxies. The attack took place outside the Gush Etzion settlement of Bat Ayn near Beit Lahem. The U.S. Department of State declared this firebombing a terrorist act ( ¶26).

Plaintiff Abdul Karim Bsharat, is a U.S. resident and a Palestinian citizen who is the Mayor and Sheikh of Jabba, a village about five miles from both Jerusalem and Ramallah near the Ulpana settlement.  The mosque in Jabba was burned and vandalized on June 19, 2012 with the graffiti warning in Hebrew of a war over the impending evacuation of the small, disputed Jewish settlement of Ulpana (¶27).

Plaintiff Father Claudius Archimandrite, a citizen of Greece, is the superior of the Greek Orthodox Monastery of the Cross located in a park southeast of the Israeli Museum and the Knesset, which was attacked on December 12, 2012.  Cars belonging to the Monastery were vandalized with spray-painted messages "Jesus, son of a whore," "Price Tag," and "Victory for the Maccabees," a reference to the biblical victory of the Jews over the Greeks (¶29).

Plaintiff Nemir Fathi is a Palestinian citizen from Asira Al-Qibliya.  He was shot by a settler from the Yitzhar settlement (¶30).  Plaintiff Monir Quadous is from Nablus.  On October 10, 2010 at around 10:00 a.m., he was attacked and beaten by settlers near Route 60, close to the Yitzhar settlement (¶31).

Plaintiff Najeh Safadi is also from Nablus.  On May 26, 2012, a settler shot and wounded him in a clash that began when some 25 settlers from Yitzhar, several carrying guns, set fire to wheat fields and an olive grove near the village of Orif in occupied Palestine.  Mr. Safadi was handcuffed by a guard from the Yitzhar settlement who threw him to the ground and shot him while other settlers kicked him.  He was in serious condition and transferred to the Rafidia Hospital in Nablus.  This shooting was confirmed by an Israeli military spokesman (¶32).

Plaintiff Borosoli Eid is a policeman from Burin Village near the Yitzhar.  On April 19, 2012 at about 2:30 p.m., more than 15 settlers walked onto his land shooting stones with slingshots, and when they got closer to Mr. Eid, one of them shot him twice with a firearm striking him in the hand and in the leg.  Mr. Eid was hospitalized and had surgery on his arm. Afterwards Mr. Eid moved to Givat Ronen where: "Twice they burned the house and four times they tried to stop the construction.  They smashed tiles and cinderblocks to try to break the foundation pillars.  They burned the logs for the roof."  Mr. Eid said, "I fear for my children. Every night I am afraid they will come back again." (¶33).

The violence by settlers against Palestinian civilians in occupied Palestine is part of daily life, a reality that has continued for decades.   In recent years, these terrorist attacks have increased dramatically producing a situation of constant fear and insecurity among Palestinians. The EU described the nature of the attacks in a report:  "Settler attacks against Palestinian livelihoods, including the takeover and damage to private property, regular vandalism of cars, hindered access to agricultural land and attacks on livestock and agricultural land." (¶76).  The EU report confirms that there has been no widespread response from the Palestinian side.

As the foregoing shows, the defendants are funding and financing what the U.S. regards as terrorism, as reflected in Legislation drafted by Congress, and their actions also constitute a tort under international law. These funds used to finance these acts are directly traceable to defendants, these funds proximately cause the harm, and, but for these funds, the Settlers who harmed the plaintiffs would not be able to have committed the acts alleged.

## ARGUMENT

### POINT I

### PLAINTIFFS' ATA CLAIM ALLEGES FACTS THAT FIT SQUARELY WITHIN THE DEFINITIONS OF THE ATA.

The ATA Claim (First Cause of Action") should not be dismissed under *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) or *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118 (2d Cir. 2013).

Plaintiffs have standing to bring this lawsuit since the funds defendants wire to the Settlers are fairly traceable to the Settlers. *Rothstein*, 708 F.3d at 93 ("the more U.S. currency [the Settlers] possessed, the greater [their] ability to fund [terrorists like the Hilltop Youth] for the conduct of terrorism; and the greater the financial support [terrorists like the Hilltop Youth] received, the more frequent and more violent the terrorist attacks they could conduct. The fact that plaintiffs did not more specifically describe the scale of [defendants] financial transactions with [the Settlers] as a 'primary' or 'significant' source of [the Settlers'] cash supply is irrelevant.")

**Proximate cause is**
**alleged in the Complaint.**

The allegations plausibly and in considerable detail show that the defendants' transfer of U. S. currency to various settlers in Occupied Palestine caused plaintiffs' injuries and are not deficient in the manner specified by the Second Circuit in *Rothstein* (708 F.3d at 97). The complaint alleges that the funds by defendants were wired to the Settler organizations from which terrorism is committed against plaintiffs.

Contrary to Defendants' assertion, in fact, the complaint alleges that the defendants were "a participant" in "terrorism." U.S. law defines "terrorism" in various places. One definition is

"premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."   Significantly, "terrorist activities" include "fundraising" and "financing." 22 U.S.C. § 2256f(d).  See Complaint, paras.104,105,109 and 110.

**The ATA does not require Terrorists**
**to be part of a designated FTO.**

There is no requirement under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 and 2333, that the persons committing international terrorism have been designated by the State Department as a "foreign terrorist organization." ("FTO").  The Complaint alleges that "Defendants provided material support and financial aid to the settlers who commit 'Price Tag' attacks against people and property in Occupied Palestine, which have been labeled terrorist acts by the U. S. State Department."  (Para. 9).  "Any national of the United States injured in his or her person, property or business by reason of an act of international terrorism . . . shall recover threefold damages he or she sustains and the cost of the suit, including attorney's fees."  18 U.S.C. § 2333(a).  Under the ATA, "International terrorism" means activities that:  "(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State . . .  (B) appear to be intended – - (i) to intimidate or coerce a civilian population . . . and  (C) occur primarily outside the territorial jurisdiction of the United States . ." 18 U.S.C. 2331(1) (A)-(C).

Just as all of Hamas' activities do not involve terrorism, not all of the activities of the Settlers involve terrorism.  Hamas has its militant wing which engages in terrorism and the Settlers have militants like the "Hilltop Youth" and Rabbis who advocate "the killing of non-Jews" and other terrorists (*See, e.g.*, Amended Complaint ¶¶ 63-64).  *See Strauss v. Credit Lyonnais, S.A.* — F. Supp. 2d --, 2013 WL 751283 (E.D.N.Y. 2013) (that the French and the EU

"have decided that they have insufficient evidence to sanction [the charity] under their own governing law, does not mean that [the charity] was not supporting a terrorist organization for purposes of the ATA").

Plaintiffs allege that the funds "were given" to Terrorists like the Hilltop Youth. The Complaint states: "[t]he money collected by the Defendants is provided directly to the Settlers or organizations controlled by them and used to build and maintain the Illegal Settlements, illegally take land in Occupied Palestine, to support the attacks by the Settlers on Palestinians living in Occupied Palestine, and to support the terrorist acts of the Settlers against Palestinians and other persons in Occupied Palestine." (¶ 8).  Indeed, "had not" defendants transferred the funds they solicited to the Settlers, terrorists like the Hilltop Youth could not have engaged in international terrorism as defined in the ATA.  The Complaint alleges that "the defendants carried out wire transfers with the specific purpose and intention of enabling and assisting the so-called 'Hilltop Youth' who have carried out hundreds of terrorist attacks against Palestinians." (Para. 69). The Complaint further alleges that defendants are also the proximate cause of plaintiffs' injuries because the Settlers would be unable to live in Occupied Palestine or build and maintain the Illegal Settlements but for the material support and financing provided by the defendants." (¶ 98).

*In re Terrorist Attacks on September 11, 2001* is distinguishable from this case because, while it notes that the complaint in that case failed to allege that money was provided directly to Al Qaeda or that money "actually was transferred to Al Qaeda and aided in the September 11, 2001 attacks" (714 F.3d at 124), the complaint here alleges that the funds were directly transferred by defendants to the Settlers and financed the "Price Tag" and other attacks on individuals and property in Occupied Palestine.

**The Complaint does not rest on
conclusory allegations.**

The Complaint meets the plausibility standard with respect to the need for a causal relationship as set forth in *Bell Atlantic Corp v. Twombly,* 550 U.S. 544 (2007) and discussed in *Rothstein,* 708 F.3d at 97.  The Complaint very directly and plausibly alleges that the money transferred by defendants goes directly to the Settlers, who could not afford to live in Occupied Palestine without such funding,  including the Hilltop Youth and others engaging in international terrorism under the ATA by directly attacking Palestinians and Christians, including American citizens, in an attempt to coerce and intimidate them.

It does not follow, *a fortiori,* from the dismissal of the complaints in *Rothstein* and *In Re Terrorist Attacks on September 11, 2001,* that the Complaint in this case must be dismissed. Defendants characterize the alleged acts of terrorism on September 11th as "far more devastating and illegal" and the "price-tag graffiti" as "at most vandalism to property" because it does not involve loss of life.  Defendants can try to diminish the magnitude of the harm but they cannot ignore the definition in the law. The ATA defines "international terrorism" as "activities that… appear to be intended to intimidate or coerce a civilian population," which is precisely what the Hilltop Youth and other Settler groups intend to do to persons living in Occupied Palestine, including the U.S. citizen plaintiffs.

Defendants state that "defendants in this case committed no crime whatever by providing funds and resources to the Settlers."  Defendants themselves make many conclusory allegations. Whether that statement is true will not be decided in this civil proceeding. *But see* 18 U.S.C. §2339C (Prohibitions against the financing of terrorism).

Defendants also state that there are no "non-conclusory allegations to support a finding of culpable knowledge" under the ATA.  The law on what is culpable knowledge under the ATA is

14

well developed.  Defendants knew or were indifferent to whether the Settlers they financed were committing terrorist acts. *Boim v. Holyland Found. for Relief & Dev.,* 549 F.2d. 685, 693 (7th Cir. 2008)(en banc) ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.").  The Complaint alleges the attacks are widely reported in the press and defendants certainly must be aware of the attacks.  *See also Gill v The Arab Bank*, 893 F.Supp.2d 474, 506 (E.D.N.Y. 2012) ("a defendant who is deliberately indifferent to – that is, reckless with regard to – facts that should put him on notice that his actions are substantially likely to result in harm to American nationals will be more likely [to] have actions be found to be the proximate cause of any subsequent harm to Americans…").

Contrary to Defendants' statement that the complaint does not identify "any perpetrator" of terrorism, that is not so. *See, e.g.,* ¶ 98 (describing the "Hilltop Youth").  Under the ATA, any organization that provides funding to perpetrators of international terrorism that appears intended to intimidate or coerce a civilian population can be liable and may be sued.

Defendants also suggest that plaintiffs' arguments are too broad and would mean that other charities, including those that give money to Palestinian organizations, may be liable under the reasoning in the complaint.  That may very well be true under the broad reach of the ATA based on the *Boim* case and its progeny. These plaintiffs did not make the law under which they seek to recover but they have every right to try to use it.

Moreover, any giving to Palestinians, such as those in Gaza, is very closely monitored to ensure that it is not given, for example, to Hamas. Here, too, monitoring of the recipients of the giving may be the answer. http://www.jewishvirtuallibrary.org/jsource/US-Israel/paaid12.html.

## POINT II

### THE ALLEGATIONS OF THE ATS CLAIM DETAIL THE FINANCING AND FUNDING OF VIOLENCE INTENDED TO INTIMIDATE AND COERCE THE PLAINTIFFS IN VIOLATION OF ESTABLISHED NORMS OF INTERNATIONAL LAW NOW ALSO CODIFIED AND DEFINED UNDER U.S. LAW.

Defendants devote only a small portion of their motion to dismiss to the ATS claims. They refer to plaintiffs' assertion that the settlements in Occupied Palestine are illegal and then try to limit the ATS claim to financial assistance to Settlers residing in these areas which Defendants argue "is, by no stretch of the imagination" a violation of the law of nations. This is not what plaintiffs are alleging is a violation of the ATS. Plaintiffs allege that defendants are providing funding and financing to Settler organizations which have among them Settlers who attack civilian non-Jews in an attempt to intimidate and coerce them into leaving the land on which they live. This is a violation of the law of nations. *See, e.g., Almog v. Arab Bank PLC*, 471 F.Supp.2d 257 (E.D.N.Y. 2007) (holding that allegations that a bank is alleged to have knowingly provided banking and services that facilitated the actions of terrorist organizations constituted a violation of international law under the ATS).

Defendants next argue that the residence of Israeli citizens in Judea and Samaria does not violate international law. They challenge the reliance by plaintiffs on the definition of terrorism in 22 U.S.C. § 2656f(d). They say the statute does not define terrorism for purposes of criminal or civil liability or as a definition of international law. They contend that even though the U.S. State Department may, in defendants' words, "arguably" view as terrorism "for reporting purposes" acts including "the graffiti vandalism" in the "price tag attacks," such conduct does not become terrorism for civil or criminal liability.

Defendants once again try to narrow plaintiffs' claim by focusing on only part of the allegations in the complaint. This case is not only about graffiti, however unpleasant it may be for someone to write anti-Christian smut on a monastery. The mosque in Jabba was burned and vandalized (Complaint, ¶¶ 27-28).  The State Department has also labeled other violence as terrorism including the firebombing of the taxi cab in which the Hay family suffered severe burns as alleged in the complaint. ( ¶ 26).

Defendants also miss the significance of U.S.C. § 2256f(d) when they argue that the statute does not define terrorism for purposes of criminal or civil liability or as a definition of international law.  Indeed, the words of the statute used to define the word terrorism – "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents" -- like the words used in the ATA -- conduct that appears to be intended "to intimidate or coerce a civilian population" -- are derived from international law. *See Almog v Arab Bank PLC*, 471 F.Supp.2d at 276-80, for a detailed examination of various U.N. Resolutions and Conventions which define violations of international law by reference to attempts to "intimidate" a civilian population.

Next, defendants refer to the "conclusory pejorative allegations of Paragraph 107 of the Amended Complaint" but then make references to allegations that are not in that paragraph of the complaint.  Paragraph 107 states: "The Illegal Settlements in and of themselves, which are funded, financed, and maintained with funds from the Defendants, are a violation of the Law of Nations."  Defendants respond to this allegation by arguing: "Whether or not the United States foreign policy approves of such settlements and whether or not the United States permits government funds to benefit such settlements, the United States has never asserted that their existence or the residence of Israelis in that area violates international law.  Nor does United

17

States tax law prevent American charities that qualify under Section 501(c)(3) of the Internal Revenue Code from providing financial support to persons living in 'West Bank' settlements."

Paragraph 107 of the Amended complaint is an allegation founded on widespread criticism of Israel as having violated international law in permitting the Settlements in Occupied Palestine. The United States condemns Israel's settlement policy but takes the position that these statements reflect a bias against Israel and are "unhelpful" to the peace process. *See, e.g.,* Kershner, New York Times, January 31, 2013, *U.N. Panel Says Israeli Settlement Policy Violates Law.* http://www.nytimes.com/2013/02/01/world/middleeast/un-panel-says-israeli-settlement-policy-violates-law.html?_r=0.

Plaintiffs are individuals, a mosque and a monastery seeking to recover under the ATS for defendants' financing of what they regard as Illegal Settlements from which Settlers attack them. Whether Israel is violating international law is not an issue in this lawsuit. The issue is whether defendants' financing the Settlers, which include the Settlers who attacked plaintiffs, is a violation of international law. Plaintiffs seek to prove in this action that it is.

As for whether the Internal Revenue Code prohibits the use of charitable donations to finance attacks in another country, while it is difficult to understand how the Code could authorize the use of donations for such purposes, that issue will not be decided in this lawsuit. In any event, the widespread questioning in the press of this use of tax deductible donations (*see, e.g.*, Amended complaint ¶ 43, quoting from The New York Times, *Tax Exempt Funds Aiding Settlements in West Bank*, July 5, 2010) and the *Boim* case were the genesis of plaintiffs' claims. http://www.nytimes.com/2010/07/06/world/middleeast/06settle.html?pagewanted=all&_r=0

Defendants next argue that their financing of violence against plaintiffs does not violate international law because the law of nations is limited under the ATS to "a handful of heinous

actions … each of which violates definable, universal and obligatory norms." *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984), cited in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) and *Orkin v. Swiss Confederation*, 444 Appx. 469, 472 (2d Cir. 2011). Defendants then state: "Residence in 'the West Bank' hardly qualifies as a 'heinous action.'"

Plaintiffs have no idea why defendants think their claims are based on the mere "residence" of the Settlers unless this is simply a way to avoid discussion of their own conduct. But defendants cannot really be arguing that this out-of-context statement in the *Tel-Oren* case ends the discussion.  As the Supreme Court said over a century ago: "[T]he period of 100 years which has [elapsed since the enactment of the ATS] is amply sufficient to have enabled what originally may have rested in custom or comity, courtesy or concession, to grow, by general assent of civilized nations into a settled rule of international law." *The Paqete Habana*, 175 U.S. 677, 694 (1900).  *See, e.g.*, *Filartiga v. Pena-Irala*, 630 F.2d 876, 881(2d Cir.1980) ("courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today"), which is also cited repeatedly and favorably in *Sosa*.  What constitutes a violation of the Law of Nations in 1789 was certainly more than the three things, an attack on a diplomat, another diplomatic transgression and piracy, that were the rationale for enacting the ATS.

In their final comment, defendants incorrectly assert that plaintiffs invoke the Oslo Accord as if it were a treaty of the United States ratified by the Senate.  Plaintiffs make no such argument and have no intention of doing so. The Oslo Accord is significant because it is part of an international consensus that condemns the Settlements and the violence against non-Jews in the West Bank which plaintiffs contend is financed by defendants.

The centerpiece of defendants' arguments against the ATS claims, as well as the ATA claims, is the Second Circuit's holding in the *September 11, 2001* case. They argue that if there is no "international consensus" that the 9/11 attack was prohibited by international law, then how can international law prohibit Israelis from living in the West Bank. By making this argument, defendants are trying, once again, to make it seem as if plaintiffs' claims are all about the Settlements. Defendants know this is not so. Plaintiffs are seeking, like so many other victims before them, to recover from those who finance the violence that injured them.

It is also not necessary for plaintiffs to recover under the ATS to show that another 9/11 attack would violate international law, although one certainly would hope so now more than 12 years after that horrible day. It is also not necessary for plaintiffs to establish that terrorism is a violation of international law, although there are many who would say the law has reached that point. *See generally* Setty, *What's In a Name?   How Nations Define Terrorism Ten Years After 9/11*, 33 U. Pa. J. Int'l L. 1 (2011); *The Criminology Of Terrorism:  History, Law, Definitions, Typologies*, by Tom O'Connor, Program Manager of Criminal Justice and Homeland Security, Austin Pey State University at Ft. Campbell, KY.

It is the conduct of the actors that determines whether there is a violation of international law and not the label for that conduct.  *See, e.g., Almog* where "[t]he court explained that its holding was limited to the specific allegations before it, and not based upon a cause of action for "terrorism" generally."  *Almog*,  471 F.Supp.2d at 280 ("[T]here is no need to resolve any definitional disputes as to the scope of the word 'terrorism,' for the Conventions expressing the international norm provide their own specific descriptions of the conduct condemned.  Although the Conventions refer to such acts as 'terrorism,' the pertinent issue here is only whether the acts as alleged by plaintiffs violate a norm of international law, however labeled.")

In this case, plaintiffs maintain that there is international consensus that violence which is intended to coerce or intimidate a civilian population is a violation of international law for which they can recover in tort under the ATS.

While defendants try to diminish the significance of the "price tag" attacks as simply "graffiti" by unknown assailants, it is hard to imagine that defendants do not know the significance of these attacks. If someone writes "KKK" on a black church or a synagogue, a hate crime under New York law, this is a threat to kill or drive blacks or Jews out of the neighborhood. If someone writes "Victory for the Maccabees," a reference to the biblical massacre of Greeks by Jews, on a Greek monastery near Knesset (Amended Complaint ¶ 29), this is a threat to kill or drive Christians off the land.

Defendants also argue that they cannot be liable for the actions of unknown assailants. There is no requirement in the law that defendants know precisely what individual from the Hilltop Youth attacked a particular plaintiff since there are many assailants. Some were specifically identified by some plaintiffs who informed the Israeli authorities. Many attacks emanate from the Od Yosef Chai Yeshiva in the Yitzhak Settlement. Defendants know who the assailants are since the attacks are reported in the Israeli press on what often seems like a daily basis.

Defendants also complain that this case is a "poorly disguised attempt to cripple five upstanding American charities." What is disguised is that defendants use charitable donations to support violence. This assertion should come as no surprise to defendants since the New York and Israeli press have been writing for years about donations to U.S. charities being given to groups in the Yitzhak Settlement and used to support violent attacks in the West Bank. Indeed, Defendant Central Fund earmarks money for these the Yitzhak groups, even when Israel is trying

to stop funding for them. Whether defendants provide aid to good causes is not the issue. The issue is whether defendants' funds are also supporting unlawful acts. *See Almog,* 471 F. Supp. 2d at 287 ("acts which in themselves may be benign, if done for a benign purpose, may be actionable if done with the knowledge that they are supporting unlawful acts"). This is what plaintiffs seek to prove is true of defendants. Under international law defendants can be found liable even though they did not directly perform the underlying acts as long as they provided the money. *See Presbyterian Church of Sudan v Talisman Energy*, 244 F. Supp.2d 289, 320-32, 289, 320-321 (S.D.N.Y. 2003).

The financing of the Settler groups, which includes Settlers whose actions are intended to intimidate or coerce the non-Jewish civilian population of the West Bank, fits squarely within the definition of international terrorism in the ATA. By the same token, defendants' actions alleged constitute a violation of international law actionable under the ATS. Both the U.S. citizen plaintiffs and the alien plaintiffs can recover for the same acts by defendants. *In re Chiquita Brands Intern., Inc. Alien Tort Statute and Shareholder Derivative Litigation*, 792 F.Supp.2d 1301, 1314 (S.D. Fla. 2011) ("there is no conflict between the ATA's provision of civil remedies for U.S. nationals injured by acts of terrorism and the ATS's provision of civil remedies for aliens injured by violations of international-law norms").

Defendants seek to persuade the Court that these claims are not actionable because the acts of violence are simply vandalism and graffiti, that they are not as "heinous" as those on 9/11 because they do not involve suicide bombings, or because, despite the firebombings and shootings, no plaintiffs in this action were killed. But that is not the law in America or internationally. The defendants are financing systematic efforts by violent, easily identified Settler groups to drive the non-Jewish civilian populations out of the West Bank and East

Jerusalem. Plaintiffs should and do have the right to recover from defendants for financing violence under both the ATA and the ATS.

## CONCLUSION

For the reasons set forth above, defendants' motion should be denied in its entirety.

Dated: New York, New York
      September 26, 2013

Respectfully Submitted,

**MELITO & ADOLFSEN P.C.**

By: _____
Louis G. Adolfsen (LA 5431)
*Attorneys for Plaintiffs*
233 Broadway
New York, New York 10279
Telephone: (212) 238-8900
Facsimile:  (212) 238-8999
E-mail: lga@melitoadolfsen.com

S. Dwight Stephens (SS 2161)
Rania Shoukier (RS 7317)
Michael F. Panayotou (MP 7744)
E-mail: sds@melitoadolfsen.com
E-mail: Shoukier@arablegalusa.com
E-mail: mfp@melitoadolfsen.com

*M&A 102037*

23